Renato Libric, 24907-111
Taft Correctional Institution
P O Box 7001, Taft
CA 93268



# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

MOOSE RUN LLC
        Plaintiff

v

RENATO LIBRIC, Does 1-10
        Defendant

Case No. 4: 19-cv-1879-MMC

AMENDED REPLY TO COMPLAINT AND
REQUEST TO FILE EXHIBITS "B"
AND "G" BY DECEMBER 31, 2019 OR
WHEN AVAILABLE.

TO THE ABOVE HONORABLE COURT AND ALL PARTIES OF RECORD

PLEASE TAKE NOTICE that the defendant in this matter hereby files
his amended reply to the complaint as ordered, and requests an
extension of time to file Exhibits "B" and "G" referenced in the
Reply to December 31, 2019.

This motion is based on the declaration of Renato Libric dated
November 19, 2019, attached hereto, the Memorandum of Points and
Authorities hereto, the files and records in this case and in the
interest of justice.

Respectfully submitted                    Dated: November 19, 2019

_____

Renato Libric
Defendant pro se

-i-

## DECLARATION OF RENATO LIBRIC

I, Renato Libric, hereby declare that I am the defendant in this matter, Case No. 19-cv-1879-MMC, and that the contents of this declaration are true and correct to the best of my knowledge and belief.

I have amended my reply to the plaintiff's summons and complaint, as ordered by the Court, and referenced certain exhibits that support my contentions and arguments.

Two of the exhibits referenced, Exhibits "B" and "G" relate to the forensic accountants report, and the transcript of a telephone conference call, respectively.

Although I have referenced them, I am at this time unable to attach them to my amended reply because I have not yet received them here at Taft Correctional Institution.

I originally requested these exhibits in September, or earlier, and I understood that at least one copy of each exhibit has been mailed to me, however, I have received nothing. I do not know whether the mailings have been lost, delayed or damaged, or whether there is a security restriction imposed here at Taft C.I.

I was informed recently that I have "dead mail" to be collected, but this has not yet materialised, so I do know whether such mail, includes the missing exhibits.

I have been able to received portions of the referred to exhibits through the Jpay messaging system, but I am informed by the prison authorities that it is not possible for me to print out any Jpay

messages. I am however, able to read the text of the portions sent to me via Jpay messaging, for the purpose of drafting my amended reply.

I am typing this declaration at 6-00pm on Tuesday November 19, 2019, after having ascertained from my Unit C.O. that there is no incoming mail for me today, and therefore I am going to mail my amended reply without exhibits "B" and "G", but with this declaration explaining the circumstances of the omission.

I also respectfully request the Court to grant me an extension of time to file Exhibits "B" and "G" to December 31, 2019. If for any reason, I am unable to receive these exhibits at Taft C.I. I will make arrangements for them to be mailed directly to the Court and to the plaintiff herein.

I apologise for any inconvenience caused to the Court and to the Plaintiff, for the absence of these exhibits, and I will excercise all dilligence in ensuring that the missing exhibits are filed with the Court and Plaintiff by December 31, 2019.

I, Renato Libric, hereby declare that the content of this declaration is true and correct to the best of my knowledge and belief, under penalty of perjury according to the laws of California and the United States.

Executed at Taft, County of Kern, CA 93268, California on Tuesday November 19, 2019.

Renato Libric
Defendant pro se

-iii-

LIST OF EXHIBITS

| Exhibit No. | Description | Page No. |
|---|---|---|
| A. | Calculation of value of Bouxtie business | 3 |
| B. | Forensic Accountants Report | 5 |
| C. | Board Guideline valuation of Bouxtie for purposes of a stock offer, and minutes of the meeting. | 8 |
| D. | S.E.C. "Small Entity Compliance Guide" concerning disqualification of Felons and other bad actors. | 27 |
| E. | Financial projections from 2018 to 2021 Projected balance sheets | 26 |
| F. | Outline details of Wellington Shields | 28 |
| G. | Conference call transcript excerpt | 29 |

## MEMORANDUM OF POINTS AUTHORITIES AND BASIC REPLY TO COMPLAINT

Defendant has been served with a complaint alleging, inter alia, fraud/false promise, racketering, breach of contract, breach of duty of good faith and fair dealing, conversion unjust enrichment, and fraudulent transfer of funds. Plantiff is seeking compensation, damages, exemplary damages, interest attorney fees and other unspecified awards.

Plantiff makes vague, generalized claims and wild misleading false statements in support thereof unsubstantiated by any evidence, or exhibits, concerning a period of activity that is rich in documents, such as bank records, customer account statements, Due Dilligence reports authorised by Plantiff's own technical and financial analysts and experts, Due Dilligence reports by Keiretsu Capital, independent forensic accountants report, Bouxtie Inc trading and revenue accounts, research and development files, emails and correspondence between Plantiff and Defendant.

Plantiff exhibits none of this information which is relevant to the suit, and crucial for the Court to understand the issues in this case.

Defendant Libric needs much of these records, documentation and communications to adequately reply to this complaint. However Defendant is incarcerated at Taft C.O. without funds and subject to prison security systems that restric the in-flow and outflow of email, provide a very limited message facility, instead of a normal email process, thus depriving inmates of access to any legal or educational website, such

as Pacer, Weslaw, Lexis Nexus etc., or to any email address
which is not approved family, friend, legal or religious mess-
age contact.

Since Defendant recieved service of process, he has dilligen-
tly worked to contact, former colleauges, customers, legal and
professional advisors, to locate many of the records and doc-
uments as possible. In addition Defendant has entreated his
family to provide sufficient funding to engage an attorney
firm to litigate this action. Please see Declaration of Renato
Libric dated September 18, 2019 for particulars the communica-
tion inadequacies and difficulties have made.

### REPLY TO PLAINTIFF'S COMPLAINT

#### A. JURISDICTION

1.   Re Para 2 - Plaintiff incorrectly states that Defendant Libric
     is "majority shareholder of Bouxtie Inc" in fact, Plaintiff's
     representative and majority shareholder David Lipson  is also
     owner and chief executive of Bouxtie Inc, owning 30 per cent
     of Bouxtie Inc.

2.   Re Para 4 - Court does not have jurisdiction because contro-
     versey - excluding set off and counterclaim - does not exceed
     the value of $75,000 - see 6 below.

3.   Plaintiff has already been compensated under Mandatory Victims
     Restitution Act for the full extent of his investment claim of
     $1,500,000 in addition he had retained the shareholdings that
     this investment purchased, so he has been compensated twice.
     Furthermore, in order to settle all possible claims for dama-

-2-

ges and MVR claims, Defendant transfered to Plaintiff title to additional 30% of Bouxtie Inc's total share capital valued commensurately to the value placed by the Plaintiff on his own purchase, at $11 million or $13.2 million based on expected future business. See Exhibit A for calculation.

4.  Plaintiff has therefore at a minimum, recieved or is recieving total compensation of $11 million compared to Plaintif's investment cost of $1,500,000.

5.  Plaintiff has failed to allege facts in his complaint that entitle him to any general, special or exemplary damages that could exceed the compensation already received by Plaintiff. Moreover, as alleged herein see pg. 14 (45) below, Plaintiff willfully obstructed and or refused a repayment of his convertible loan at a 100% premium that Bouxtie and Defendant had arranged, prior to any litigation between the parties. Plaintiff is not entiteled to damages that result from Plaintiffs own misbehaviour and greed.

6.  Plaintiff is citizen of Wyoming, with main business office in Nevada. Defendant is resident of California therefore this Court has Jurdistiction only if "the matter in controversey exceeds the sum value of $75,000 exclusive of interest and costs" see 28 USC §1332 (a)(1). Plaintiff has not pled any facts with sufficient particularity to establish that he has exceeded the §1322 threshold, accordingly the complaint should be dismissed for lack of jurisdiction, leaving only the counter-claim to adjudicate.

-3-

## B. OBJECTIONS TO COMPLAINT'S STATEMENT OF BACKGROUND FACTS

7.   Re Para 12

Defendant denies that he provided Plaintiff with "present-
ation package" through Erica Lill. Any presentation provided
by Erica Lill or Keiretsu Capital was the product of their own
Due Dilligence into Bouxtie, which Plaintiff admits to in Para
47. (Pg.7) Plaintiff provides no facts sufficient to substan-
tiate his claim of "forgeries".

8.   Re Para 13

Defendant agrees that copies of a "Note Purchase Agreement"
and and "Unsecured Convertible Note Agreement" where sent to
Plaintiff, but denies his claim of forgery. Plaintiff provides
no facts sufficient to substantiate his claim of "forgeries".

9.   Re Para 14

Defendant denies he has "embezzeld" any money from any person,
bank, account, or other entity. Plaintiff provides no facts
sufficient to substantiate his claim of "embezzelment".
Furthermore the forensic accountants report of August 2018
which investigated the financial history and transactions of
Bouxtie Inc, and the Defendant, covered more than 20,000
transactions and concluded that no money belonging to Bouxtie
Inc had been misappropriated, that there was no evidence of
any off shore activity, that all monies received by Bouxtie
Inc from Plaintiff had been applied exclusively for the benfit
of Bouxtie. The United States Prosecutor stated at Defendant's
sentencing that Goverment concluded that the forensic accoun-

- tants report was correct, and that the Court could consider the report's findings as grounds for a downward departure. The report is attached hereto as Exhibit B.

10. Re Para 15

Defendant denies he made any representations that Plaintiff relied on to enter into transaction with Bouxtie. In fact and in truth, Mr. David Lipson, owner, CEO and controling shareholder of Plaintiff hired a techincal expert whose name will be identified during discovery, to independently examine and opine on the merits of the proprietary digital software, source code, and programs of Bouxtie digital gift cards, hired a financial expert, whose name will be identified during discovery, and C.P.A ditto to above, to investigate and report on the structure and financial health of Bouxtie, and personally interviewed each Board member and key personel of Bouxtie to assess it's management strength.

11. Plaintiff provides no facts sufficient to substanitate his allegation that a) Defendant made any representation that Plaintiff relied on, and b) that Defendant is the controlling shareholder in Bouxtie, or a shareholder at all.

12. Re Para 17

Plaintiff mistakes the contractual agreement to appoint Mr. David Lipson to the Board of Bouxtie. Mr. Lipson's appointment was conditional on the closing of the qualified financing of Series B round of at least £10,000,000 which Mr. Lipson obstructed by his actions, misbehaviour, and attack on Bouxtie

-5-

financial well being - see counterclaim below.

13.   Re_Para_19

Defendant denies he represented to Plaintiff as "extensively and experienced in financing or highly experienced technology person". Plaintiff provides no facts sufficient to support this allegation.

14.   Re_Para_20

Defendant denies making "explicit representation of pending contracts with customers, other investors, bank statements and corporate resolutions". Defendant denies that Plaintiff relied on any explicit representations of any officer of Bouxtie but instead relied on the explicit representations and findings of his investigation conducted by his technology expert and investigating financial expert, who provided Due Dilligence to Plaintiff at all relevant times. Deffendant agrees that Plaintiff signed the Note Purchase Agreement, Un-securedConvertible Note, Stock Purchase Agreement and Suplemental Agreement. Plaintiff has not provided facts sufficient to substantiate his allegations that Defendant made any explicit representations as claimed, or at all, and that Plaintiff relied upon them.

15.   Re_Para_21

Defendant denies that he provided "a forged docusigned entirely by Plaintiffs corporate resolution from Board of Directors", as alleged.

-6-

16.   Docusigned electronically delivered documents cannot be "for-
      ged" they are safe, secure and protected by company algori-
      thms know only to the Docusign corporation. Like a corpora-
      tion seal, a signature may be applied without authority or
      inappropriately, or a signature may be drawn or replaced.
      The delivery of Docusigned electronic signature is always a
      genuine signature. Exibit "5" clearly shows a genuine Docu-
      signed resolution. Plaintiff has provided no facts to substa-
      ntiate his allegation of a forgery.

17.   Re_Para_22
      Defendant agrees with Plaintiff that the stock certificate
      is valid, but denies for the reasons seth forth in 16 above
      that such Docusigned signatures are, or could be "forged".
      Furthermore, Defendant denies that the issuance of the valid
      stock certificate was "never authorized". Plaintiff has pro-
      vided no facts to substantiate his allegation that stock cer-
      tificate signatures where forged, or that the certificate was
      never authorised.

18.   Re_Para_23
      Defendant denies Plaintiff's purported claim that the Board of
      Bouxtie was unaware of Plaintiff's agreement to subscribe for
      947,059 shares. Every Board member met Mr. Lipson twice at a
      specially convened meeting to facilitate the Plaintiff's Due
      Dilligence prior to Plaintiff's stock purchase. Plaintiff
      does not particularise the meaning of the phrase "investment
      transaction" nor provide facts to substantiate his claim that
      Bouxtie directors were not aware of the investment transaction.

Furthermore item 15 of the minutes of the meeting of Bouxtie
directors on November 28th, 2017 authorised Defendant to raise
$15,000,000 at a pre-money valuation of $75,000,000. See
Exhibit "C" attached hereto.

19.   Re Para 23-27

Defendant admits he plead guilty to wire fraud charge on Sep-
tember 5th 2018, and entered into Plea Agreement with respect
to a single charge, but denies that he engaged in any activity
for which purpose was to deprive Plaintiff or any potential
investors a legitimate share of Bouxtie equity.

20.   Defendant denies that "an essential purpose of the scheme was
to overstate the financial condition and prospects of Bouxtie",
but states that he followed and complied at all times with the
Board's guideline valuation of $75,000,000. See Exhibit C.

21.   Defendant denies that he was ever claimed to possess authority
to sell shares in Bouxtie Inc that he did not personaly own.

22.   Plaintiff admits in Para 14, evidence by exhibit 1 and 2, that
Plaintiff contracted to acquire shares in Bouxtie that Defend-
ant personaly owned.

23.   Plaintiff has provided no facts, sufficient to substantiate
any claim, that Defendant did not own, free and clear the
947,059 shares, or that Defendant was not entitled to transfer
such shares to Plaintiff. Plaintiff has provided no facts to

substantiate his claim that Defendant engaged in a scheme for
which the essential purpose was to "overstate the financial
condition and prospects of Bouxtie".

24. <u>Re_Para_28</u>

Defendant denies he "took multiple steps to convince members
of a Las Vegas company to invest over a million dollars in
Bouxtie". Plaintiff has provided no facts or particulars to
substantiate such allegation.

25. Defendant denies that any such scheme existed. Denies that he
"fraudulently suggested to representatives of potential inv-
estors that a large publicly traded corporation was interested
in purchasing Bouxtie at price of $150 million". Plaintiff has
provided no facts or particulars to substantiate such allegat-
ion.

26. <u>Re_Para_29</u>

Defendant denies that he "fradulently placed the signature of
an executive, with an  alleged purchasing corporation on a fo-
rged term sheet, and denies that he admitted same". Plaintiff
has provided no facts or particulars that identify a  suppo-
sed executive or purchasing corporation, or term sheet. However,
with respect to the above, defendant acknowledges receiving
multiple inquiries from agents, brokers, intermediaries, & others
claiming to represent potential or interested purchasers of part
or whole of Bouxtie's business. However, these inquiries were
usually treated by Bouxtie as a distraction from its core
objective, i.e. the development of the "Flexawards" business into
new markets and business models.

=tions by Plantiff's technology expert, Plantiff's financial expert, attorney legal advice, and communications with Bouxtie's existing investors, officers and customers.

30.  Re Para 36

Defendant denies that in March 2019 or at any time, requesting a transfer to a prison in Mexico. Denies at any time claiming he was a Mexican national. Defendant admits to being a citizen of Croatia by birth and descendency. Defendant can track his forefathers farming in the Croatia region for more than 500 years.

Plantiff has provided no facts that substantiate his claim that Defendant requested a transfer to a prison in Mexico or that Defendant claimed he was a Mexican national.

C.  THE COMPLAINTS FIRST CAUSE OF ACTION, FRAUD /FALSE PROMISE MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED.

31.  Re Para 37

Defendant repeats that he denies, disputes or otherwise contests Plantiff's conclusary statements, lacking any factual basis, as set forth in Para 1, to 30 above.

32.  Re Para 38

Defendant agrees that pursuant to the agreement between Plantiff and Bouxtie Inc, Plantiff would recieve 947,059 shares in Bouxtie Inc in exchange for the net sum of $1.5 million, being a 50% discount on the Bouxtie Inc value as agreed between the parties as follows: total shares authorised and issued were 23,676,835; valued by Bouxtie Inc

and the parties hereato, at $75,000,000. Pursuant to the agreement for Sale and Purchase of stock, 1) and 2) of complaint exibit 3, Plantiff agreed to purchase "no less than 3.99% interest in the corporation at the time of sale" i.e 3.99% of 23,676,835 shares equals to 947,059 shares at a price of 3.99% of ($75,000,000 x 50% discount) $37,500,000 = $1,500,000, i.e. the exact amount of the investment.

33. The complaint at Exibit 6, confirms the receipt by Plantiff of 947,059 shares in the ordinary stock of Bouxtie Inc, which Plantiff states "is valid".

34. Re 39-40
Defendant denies promising "to ensure" that Mr. David Lipson would be appointed to Bouxtie Inc's Board of Directors.

35. The appointment of Directors to Bouxtie is governed by the articles and bylaws of Bouxtie, of which Plantiff is fully aware from his Due Dilligence and any appointment is subject to the majority of votes in favor, at a duly convened Board meeting.

36. Plantiff's representative Mr. Lipson personally was with every member of the Board on February 19-20 2018, and was well placed to ascertain whether each member would favor or disfavor his appointment to the Board.

37. It is illogical and incredible that Plantiff would have relied on a "promise" by the Defendant, when Mr. Lipson could have easily asked each Board member himself. Further-more although Defendant denies ever promising to "ensure"

Mr. Lipson's appointment, he acknowledges he considers it likley that he would have voted in favor of Mr. Lipson's appointment, had such resolution been tabled.

38. Re 40-42

Defendant repeats that he made no promise of "ensuring" the appointment of Mr. Lipson as a director of Bouxtie, that Plantiff knew, or should have known only a majority of directors at a duly conducted Board meeting can appoint a director and that Defendant had no greater voting power than any other Board member.

39. Furthermore, the appointment of a representative to the Board of directors of Bouxtie does not carry any particular benefit, does not provide Plantiff with any special advantage, status or financial gain, accordingly, Plantiff has suffered no harm or disadvantage by not having its representative a board seat as a director.

40. Plantiff has provided no facts or particulars sufficient to substantiate his claim that "Defendant promised to ensure David Lipson appointment to Bouxtie Inc's Board of directors" no when, where or how is even attempted.

41. Re 43-45

Defendant did not seek out Plantiff as a potential investor rather Plantiff sought Defendant as a likley investment targeted through its agent Keiretsu Forum who provided Plantiff with the information and Due Dilligence that Plantiff admits he relied on, see e.g. Para 7, morover, as set forth

-12-

in 7 and 10 above, Plantiff conducted his own investigations and inquiries into Bouxtie Inc with experts provided by Plantiff himself.

42. Plantiff has provided no facts or particulars to substantiate what representations he claims Defendant made, how or when they where given, to what extent such supposed representations conflicted or differed from the Due Dilligence he had recieved from his own resources.

43. Re Para 44

Plantiff has not plead his allegation of misrepresentations with sufficient particulars. Instead he simply states every possible way communication is usualy made, i.e by phone in person, in meetings and electronic mail. He does not state which representation was made by each of their means, or when, or how or why Plantiff relied on them and do not meet the "who, what, when, where and how of the misconduct alleged as well as what is false or misleading about the purportedly fraudulent statements and why they are false", see - SALAMEH v TARSADIA HOTEL 726 F.3d 1124, 1133 (9th 2013), quoting CAFASSO v GEN. DYNAMICS CH SYS. INC., 637 F.3d 1047, 1055 (9th, 2011). General allegations without specifics that would enable a Defendant to have resonable notice so that it can defend the claim do not survive Rule 12.

44. On December 21st 2018 Plantiff was awarded compensation of $1,500,000 for Defendant violation of 18 USC §1343, pursuant to 18 USC §3664. Plantiff did not return nor offered to return any the 947,059 shares in Bouxtie Inc, to Defendant.

-13-

In full settlement of any and all compemsation, and
restitution, Defendant transferred a further 6,100,000 shares
in Bouxtie Inc to Plantiff who has now amassed a total of
7,047,059 shares in Bouxtie Inc, valued at Plantiff's agreed
figure of $1.58 per share , i.e $11,134,353 representing 35%
of Bouxtie total authorised and issued share capital.

45.  Three months after Plantiff had subscribed to the loan /
     stock purchase agreement, and received his share certificate
     Plantiff through its representative Mr. Lipson, demanded
     that Defendant should be fired as C.E.O. and replaced by Mr.
     Lipson, or Plantiff would take legal steps to remove Defen-
     dant. The Board were not in favor of this proposition, and
     offered to buy back Plantiff's 947,059 shares at full price,
     i.e at twice the price Plantiff had paid for them. Plantiff
     rejected the offer, and threatened to file a criminal com-
     plaint if his demands where not meet - see Paras C.25÷30, for
     particulars of this, and Defendant's counterclaim.

46.  Accordingly, not only does the complaint's first cause of
     action fail to state a claim upon which relief may be gran-
     ted, and should be dismissed, but Plantiff has recieved or
     is receiving compensation of 10 times his original inve-
     stment, an ammount far greater than he can resonably expect
     given the Plaintiff contributed substantially to his own
     demise.

-14-

D.   THE COMPLAINT'S SECOND CAUSE OF ACTION, RACKETEERING MUST BE
     DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY
     BE GRANTED

47.   Bouxtie Inc was founded in October 2014, after two years of
      research by Defendant and Mr. Sergej Skaro  and expenditure,
      excluding time, of circa $650,000. The purpose of the resea-
      rch was to produce a digital wallet or gift card that could
      replace plastic gift cards and be digitally transferred to
      a recipient and "spent" at a retail store, or redeemed via
      mobile phone at the POS terminal at a retail merchant. Since
      the founding of Bouxtie Inc, the corporation has created and
      "sold" approximately one and a half million digital gift
      cards to over 400 customers, such as Amazon, Maceys, Target,
      Starbucks, Salesforce, Best buy and American Airlines to
      name just the few. By March 2018 Bouxtie had also entered
      into discussions with TenCent to provide digital gift cards
      in China, and with other retailers and loyalty program com-
      panies in Brazil, India, Europe and other international mar-
      kets. Bouxtie products worked flawlessly, and  were popular
      with user and recipients as each Bouxtie custmer will testify.
      Bouxtie owned and operated using its proprietary software,
      programs and source code.

48.   The complaint's racketeering claim lacks any foundation, let
      alone the required particularity that would support the "pre-
      dicate acts" of fraud that are necessary to allege a civil
      RICO violation. The elements of a RICO claim are (1) conduct
      of an enterprise (2) through a pattern of racketeering acti-
      vity. See SEDIMA, S.P.R.L v IMREX CO., INC, 473 us 479 (1985).

-15-

The failure to establish any one of these elements is fatal to RICO claim. See <u>RAE v UNION BANK</u>, 725 F.2d 478, 480-81 (9th cir. 1984), where Plantiff failed to meet the "enterprise" requirement. Defendant Libric was a director and an employee of Bouxtie Inc with a Board of three directors which Defendant did not control. The complaint's allegation that "Defendant's actions amount to conduct of the enterprise..." fails because Mr. Libric, individually, by himself, cannot be an enterprise with a discernable criminal structure.

49. The complaint's racketeering claim also fails because RICO defines the term "pattern of racketeering activity" as requiring "at least two acts of racketeering activity...the last of which occured within ten years...after the commission of a prior act racketeering activity." - 18 U.S.C §1961 (5).

50. The Supreme Court has held that "to prove a pattern of racketeering activity, a Plantiff must show that racketeering predicates are related, <u>and</u> that they pose a threat of continued criminal activity." See <u>NORTHWESTERN BELL</u>, 492 US. at 239, thus the determination of whether a RICO Plantiff is able to establish a pattern of racketeering activity necessarily entails an initial determination of whether the Defendant commited two or more predicate acts within the meaning of the RICO statute, and is so whether the predictae ascts where related in a manner such that they create a threat of continued unlawful activity, <u>NORTHWESTERN BELL</u>, 492 US. at 239-43.

51. Plantiffs complaint not only lacks any foundation but fails
to start two or more predicate acts related in a manner that
create a threat of continued unlawful activity as required
to support a violation of 18 U.S.C. 1962 - see <u>H.J. INC v</u>
<u>NORTHWESTERN BELL TELEPHONE CO</u>, 492 U.S 229 (1989).

52. Finnaly defendant categorically denies Plantiff's claims
that some or all of the Plantiff's loan to Bouxtie Inc was
used by him personally, the forensic accountant's report
completely debunks this false allegation. See <u>Exhibit "A"</u> hereto.

53. For the reasons set forth above the racketeering claim fails
to plead a violation of 18 U.S.C § 1962 with sufficient spe-
cificy, and otherwise fails to state a claim upon which relief
can be granted.

E. <u>THE COMPLAINT'S THIRD CAUSE OF ACTION, BREACH OF CONTRACT</u>
<u>MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH</u>
<u>RELIEF MAY BE GRANTED.</u>

54. Under California law, breach of contract is "a material
failure or performance of a duty arising under or imposed by
agreement" see in Para 50-60 Plantiff alleges that he agreed
to loan Bouxtie $1,500,000, which would either be repaid with
interest   or exchanged for stock in Bouxtie Inc. In Page 4,
of the complaint, Plantiff admits and agrees that (1) Plan-
tiff has valid contract with Bouxtie Inc., (2) Plantiff loa-
ned $1,500,000 to Bouxtie Inc and recived a valid certificate
for 947,059 shares in Bouxtie Inc., (3) there has been no
material failure of a duty by Bouxtie arising from that said
agreement. Plaintiff has failed to state a claim with any

-17-

particularity for breach of contract, and therefore the claim fails under rule 12(b)(6).

55. Furthermore, Plantiff alleges that Defendant Libric has breached a contract to which he is not a party i.e the agreement to repay the loan to Bouxtie Inc with interest - see complaint Exibit 2 .

56. Defendant is not a party to this agreement and cannot be liable for allegedly breaching a contract to which he is not a party.

57. Defendant Libric was a party to the agreement to provide Plaintiff with stock in Bouxtie, which Plaintiff admits was not breached by acknowledging reciept of a valid share certificate for 947,059 shares in Bouxtie Inc., pursuant to Exibit 6 of the complaint.

58. Plaintiff has not specified any default by Defendant on the contract to which he was a party, and for this reason and those set forth above, Plaintiff has failed to state a claim for breach of contract, and therefore the claim fails under rule 12(b)(6).

F. ALL REMAINING COUNTS OF THE COMPLAINT MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED.

59. "Only a complaint that states a plausible claim for relief survives a motion to dismiss." ASHCROFT v IQBAL, 556 U.S 662 (2009). Conclusory allegations and formulaic recitations of the elements of a claim do not

-18-

meet Plaintiff's burden, see IQBAL, 556 U.S. at 678, see also BELL ATL. CORP v TWOBY, 550 U.S 544 (2007) even where allegations taken as true "are consistent with" unlawful conduct. The complaint still must be dismissed if the allegations are "more likley explained by lawfull...behaviour" IQBAL 556. U.S at 680. These pleading requirements apply to each element of a Plaintiff claim. id at 680-84. "Plaintiff's, not Defendant's, bear the burden of sufficiently stating a plausible claim for relief in their complaint; they cannot rely on facts that may be discovered in yet to be conducted discovery to meet this burden." CHEEKS v FORT MEYER CONST. CORP. 216 F. Supp 3d 146, 158 (D.D.C. 2016). Under this standard, each of the Plaintiff's remaining claims fail to state a claim upon which relief can be granted. Not only because of the lack of plausible factual allegations, but also for the substantive failures and insufficiencies.

G.  THE COMPLAINT'S FOURTH CAUSE OF ACTION, GOODFAITH AND FAIR DEALING, CLAIM FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

60.  Defendant denies that he has acted in bad faith towards Plaintiff, or that the Plaintiff did not receive a fair deal from Defendant. Plaintiff alleges that  Defendant breached the duty it owed him by "failing or refusing to provide Plaintiff with stock" yet else-where in the complaint Plaintiff acknowledges receipt of a "valid" share certificate - see complaint Exhibit 6, and particulars of a stock calculations in Para 32 , Pg 11 above, so what can "failing or refusing" be construed to mean?

61. Plaintiff is seeking to introduce parole evidence to vary
the terms of the written contract of sales and purchase of
stock (complaint Exhibit 3) and imply terms into that agr-
eement that are inconsistent with it's express terms.
Furthermore, Plaintiff does not state precisely which Cali-
fornia law or code prohibits the activity complained of and
where as  here an express and binding agreement exists and
defines the parties rights a Court cannot substitute its own
notions of fairness for the terms that the contract establi-
shed  see CAL.MED.ASSN v AETNA U.S. HEALTH CARE OF CAL. 94
CAL. APP 4th 1410 1420, 49 CAL RPTR. 2d 191 (1996) where
Plaintiff is not entitled to an equitable remedy, where a
contractual remedy is available.

62. For the reasons set forth above dismissal under F.R.CIV.P.
12(b)(6) is appropriate for failure to state facts suff-
icient to make a claim upon which relief may be granted.

Plaintiff also alleged " Defendant gained and advantage...
by accepting and refusing to refund payments of money from
Plaintiff" here Plaintiff fails to particularise what
"payments of money" he is reffering to, and what duty or
obligation Defendant had to repay the "payments of money"
if Plaintiff is reffering to the note purchase agreement
(complaint Exhibit 1) or unsecured convertible promissory
note agreement (complaint Exhibit 2) Defendant was not a
party to those agreements and therfore has no contractual
nor implied duty to comply with any of the agreements terms.

-20-

63. Plaintiff fails to state any facts or particulars sufficient to substantiate Defendant gained an advantage by "failing or refusing" to perform some act that complaint fails to specify and duty to perform to an agreement Defendant was not a party to. Accordingly dismissal under F.R.CIV. P 12 is appropriate for failure to state a claim upon which relief may be granted.

H. THE COMPLAINTS FIFTH CAUSE OF ACTION, CONVERSION, FAILS TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED.

64. Defendant denies, and Plaintiff has stated no facts or particulars to substantiate the claim that Defendant exercised dominium over funds belonging to Plaintiff, which Plaintiff paid to third party Bouxtie Inc.

65. "The elements of conversion are Plaintiff's ownership or right to possesion of the property at the time of conversion, the Defendant's conversion by a wrongful act or disposition or property rights and damages." OAKDALE VILLAGE GROUP v FONG 43 CAL. APP. 4th 539, 544 50 CAL RPTR 2d 810 (1996).

66. In this case Plaintiff does not have an ownership interest in the money once he entered into the agreements (complaint Exhibits 1 and 2) with Bouxtie Inc and wired his money into Bouxtie's bank account. Upon wiring his funds ($1,500,000) Plaintiff traded his right to possesion of the funds for a contractual right to benefits under the policy.

67. Furthermore, Plaintiff's funds where wired into a Bouxtie Inc bank account, in accordance with a contractual agreement

with Bouxtie. Defendant was not a party to this agreement and exercised no dominion over the funds in Bouxtie's possession, custody or control.

68. See also JERMAN v BANK OF AMERICA, 7.CAL APP. 3d 882 87 CAL RPTR 88 (1970) where a woman sued the bank for failure to pay on cashiers checks to the named payees. The agreement between the Plaintiff and the bank created a contractual relationship, in which the Plaintiff paid consideration in exchange for the banks promise to make payment on the checks. "Since the right of the purchase to recover her consideration is based on contract she has no need to rely on tort claims for conversion."

69. Similarly, in this case, Plaintiff cannot claim for relief under a tort claim where his rights flow from a contractual agreement nor can he make a tortous  claim against Defendant who is not a party to the transaction between Plaintiff and Bouxtie Inc., and exercised no dominion over the funds received by Bouxtie. Finnaly, Plaintiff acknowledges receipt of a valid share certificate for 949,059 shares in Bouxtie Inc. He is not entitled  under the share and purchase agreement which the complaint exhibits, to both 3.99% of the Bouxtie Inc. equity, and the return of his funds, accordingly, Plaintiff has failed to allege facts against Defendant Libric that would support a claim that he unlawfully converted Plaintiff's property. Dismissal under rule 12(b)(6) is appropriate.

-22-

I.  THE COMPLAINTS SIXTH CAUSE OF ACTION, UNJUST ENRICHMENT,
    ALSO FAILS TO STATE A CLAIM FOR WHICH RELIEF CAN BE GRANTED.

70.  To prove a claim for unjust enrichment, a Plaintiff must show
     that a Defendant unjustly retained its money or property
     against fundamental principles of justice or equity in good
     conscience, and it is unjust for him to retain it. GHIRARDO
     v ANTONIOLI 14 CAL 4th 39 51 57 CAL RPTR 2nd 687 924 996
     (1996).

71.  Unjust enrichemnt is recovery in quasi contract and applies
     when there is no legal contract between the parties.

     An action based on a theory of unjust enrichment is not
     available when there is an express, written consent. Beca-
     use "no agreement can be implied when there is an express
     agreement which defines the rights of the parties" see
     CAL MED ASSOCIATION v AETNA U.S. HEALTHCARE OF  CAL, 94 CAL.
     APP 4th 151, 172, 114 CAL. RPTR 2d 109 (2001). This claim
     likewise fails under rule 12(b)(6).

72.  Furthermore, Plaintiff fails to allege facts to demonstrate
     Defendant retained any of Moose Run's property. Complaint
     clearly establishes that Plaintiff loaned Bouxtie Inc cer-
     tain funds that where to be paid back to Moose Run in Janu-
     ary 2019 or converted into stock (see complaint Exhibits 1,
     2,3 and 4). There no allegation that Plaintiff paid any
     money to Defendant Libric, indeed the complaint agrees that
     the loan funds where paid by Moose Run directly to Bouxtie
     Inc - not Mr. Libric personally, see Para 16 of complaint.

Without a personal benefit to him no cause of action for
njust enrichment exists. Complaint is devoid of any facts
to support the assertion of this claim against Defendant.
As with other claims, Plaintiff has failed to state a claim
for unjust enrichment and dismissal under F.R.CIV.P.
12(b)(c) is appropriate.

J. <u>THE COMPLAINT'S SEVENTH CAUSE OF ACTION; FRAUDULENT TRANSFER
FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.</u>

73. Complaint does not specify which statute or California code
Defendant is accused of violating.Complaint also does not
specify or identify the " who, what, when, where and how" of
the misconduct alluded to. In addition the complaint at Para
82, refers to "Defendant transferred funds procured from Pla-
intiff to Bouxtie" whereas in Para 16, complaint states
"Plaintiff agreed to invest...$1,500,000...and said funds
were wired from Nevada into Bouxtie Inc. bank account at
Sillicon Valley Bank." The complaint also fails to state
or explain what the funds transferred to Bouxtie Inc. hind-
ered or delayed, or of what Plaintiff was defrauded. Finally,
Plaintiff alleged he has information and believes that Defe-
ndant Libric "concealed or absconded with Plaintiff's frau-
dulently obtained funds" but does not provide particulars of
who, what, when, where and how, Moose Run obtained such fra-
udulent funds, or when, where and how Defendant obsconded
with them, or concealed them. In sum, this cause of action
is a swamp of vagueness and ambiguity and must be dismissed
for failure to plead with specificity, and failure to state

-24-

a claim upon which relief can be granted.

**COUNTERCLAIM**

C.1  Moose Run and David Lipson violated California business and professional code §17,200.

C.2  Bouxtie formed in 2014 to incorporate 3 years of research by interalia Renato Libric into the digitalization of gift cards and their commercialization.

C.3  The authorised and issues share capital of Bouxtie Inc. in July 2017 was 23, 676,835 spread among 30 shareholders.

C.4  Renato Libric held 6,100,000 shares.

C.5  Bouxtie Inc. Board of directors at July 2017 consisted of 3 members including Mr. Libric.

C.6  Bouxtie Inc. was successful startup company. Within 4 years it had successfuly perfected a digital gift card for use in USA and Canada, producing and selling ±1,500,000 electronic gift cards to more than 400 customers including Macey's, Amazon, Salesforce, Starbucks, Best Buy and many more.

C.7  In 2017 to 2018 Mr. Libric and his software programers developed a digital gift card prototype for use in Brazil and China. After periods of consultations, expressions of interest where made by Brazilian largest loyalty program company "DOTZ" and Chinese largest mobile app and technology company "TENCENT".

-25-

C.8   Later these expressions of interest where transformed into
      binding agreements.

C.9   Under the proposed DOTZ agreement Bouxtie would gain 10% royalty
      fees for a dollar of gross return, projected at $4.2 million in
      the first three years. See Exhibit "E" attached hereto.

C.10  Under the TENCENT agreement Bouxtie would gain 10% royalty
      fees for dollar of gross revenue projected at $350 milion in
      the first three years. See Exhibit "E" attached hereto.

C.11  To fund the expansion into Brazil and China the Board of
      Bouxtie decided to expand its capital base by $10 million or
      more.

C.12  In or about July 2017 Keiretsu Forum introduced Bouxtie Inc
      to Mr. David Lipson, who Keiretsu said was an experienced
      and sophisticated investor.

C.13  Mr. Libric and Mr. Lipson met first with Keiretsu in Seattle
      in August 2017 and again in Starbucks coffe house in Redwood
      CIty, CA. At that meeting Mr. Lipson was asked to provide
      some bacground on himself, e.g. experience, events, refe-
      rences etc.

C.14  Mr. Lipson hesitated to provide personal details saying his
      investment would be made by Moose Run LCC, "a Las Vegas Bus-
      iness" and that "it is clean".

C.15  Mr. Lipson was also asked if he had any legal problems in
      the past. Mr. Lipson denied any problems and repeated that
      Moose Run was "clean". In fact in April 2000. in a civil

action: <u>Securities & Exchange Commission v David E. Lipson</u>,
No. 97C2661(RAG)(N.D.ILL.)-LR-16861, following an eleven day
trial, Mr Lipson was convicted of violating Section 17(a) of the
Securities Act 1933, (15 USC §77q(a)0, Section 10(b) of the
Securities Act 1934, (15 USC 78(b), and Rule 10b-5, promulgated
thereunder (17 CFR 240.10b-5). Mr Lipson was ordered to pay a
penalty of $4,865,625, and disgorge profits and interest of
$969,972.

C.16   Had Mr Libric or the Board known of Mr Lipton's prior conviction
       for Securities violations, they would not have proceeded with
       any agreement to place Mr Lipson as a shareholder, because his
       presence would have compromised the efforts of Bouxtie to
       complete a 506 offering of it's stock, such as the proposed
       offering to Wellington Shields. See <u>Exhibit "D"</u> for covered person.

C.17   Mr Lipson was well aware of his convictions for securities
       fraud, but deliberately concealed them because he suspected
       that it would derail his efforts to secure a shareholding and
       directorship in Bouxtie.

C.18   On or about October 13, 2017 Bouxtie Inc., Mr Libric and
       Moose Run LLC executed final documents whreby Moose Run LLC
       would loan Bouxtie Inc. $1,500,000 which would either be repaid
       with interest, or exchanged for 3.99% of the authorised and
       issued share capital of Bouxtie Inc., valued at 3.99% of the
       sum of $37,000,000.

C.19   Approximately fifteen days later, Mr Lipson telephoned Mr Libric
       and demanded that he Lipson, be appointed as CEO, and alluded
       to what he called "irregularities" in some of the information

-27-

package Bouxtie had presented to him.

C.20   Similar harassing phone calls continued on a weekly cycle
       until January 2018, when Mr Lipson demanded to speak to the
       entire board simultaneously.

C.21   Meanwhile, Bouxtie Inc was moving on with development of
       proprietary software, programming and coding for the U.S.
       market, and for prospective Brazilian and Chinese clients, lead
       by the firms founder Mr Libric. Bouxtie Inc Directors were also
       finalizing the raising of new capital with venture capital firms
       such as Wellington Shields.

C.22   In December 2017 and January 2018, Bouxtie Inc had met with the
       private equity and venture capital firm Wellington Shields, who
       agreed, subject to completing their due dilligence, to invest an
       amount of $10 million into Bouxtie by way of additional equity
       at a price to be determined. See Exhibit "F" for outline details
       of Wellington Shields.

C.23   After Wellington Shields due dilligence was completed, they
       agreed to make an investment in Bouxtie Inc., on the following
       terms: Bouxtie to issue 3,106,286 Series "B" Stock, representing
       13% of all stock at $3.21 per share, in exchange for $10 million.

C.24   All shareholders and directors were informed of the closing
       date with Wellington Shields, and had approved the transaction.

C.25   Mr Lipson responded to this information by demanding a telephone
       conference call with all directors, and at that call demanded
       that he be appointed a director and Chief Executive of Bouxtie
       Inc. to replace Renato Libric, or he would sabotage the closing

with Wellington Shields, and torpedo the $10 million injection
of funds needed by Bouxtie Inc. to expand into Brazil, and
China. The Board of directors rejected Mr Lipson,s ultimatum
and elected to proceed with the Wellington Shields closing.

C.26   Mr Lipson's threats were reported to attorney Matechak.

C.27   On or about February 2018, attorney Matechak together with all
other Board members present on a conference call, spoke to Mr
Lipson to clarify the threats to sabotage the Wellington Shields
stock placement and investment.

C.28   Attorney Matechak asked   all present, including Mr Lipson if
they agreed to the telephone conference call being recorded.
All consented. A transcript of the call was made and is attached
hereto as Exhibit "G".

C.29   During the call Mr Lipson repeated his demand that he should
be appointed as a director and chief executive in order that
"his team" should run Bouxtie Inc. until further notice, or
until a new CEO was appointed. Mr Lipson referred to his aware-
ness of certain past irregularities that involved Mr Libric and
his own investment. Mr Lipson further indicated that these matters
could be resolved by the apointment of himself and his team to
run Bouxtie.

C.30   The Board of Bouxtie Inc. again weighed the benefits of retaining
Mr Libric as leading product design director, and C.E.O.,
against the criticisms of Mr Libric by Mr Lipson, and decided in
favor of the retention of Mr Libric in his currect positions
because of the importance of a successful entry into the Chinese

and Brazilian markets.

C.31   When Mr Lipson failed to convince the Bouxtie Board to dismiss
Mr Libric, and appoint himself as C.E.O., Lipson decided to
punish all the directors, shareholders, employees and customers
etc, by sabotaging the planned closing of the Wellington Shields
$10 million investment in Bouxtie, thereby depriving Bouxtie of
capital needed to conduct its day to day business, fullfill its
commitments to expanding the "Flexawards" business in U.S., Brazil
and China.

C.32   Rebuffed by the Bouxtie Board, Mr Lipson telephoned the Wellington
Shields Investment Manager Mr Sunny Jian, and advised him that
Moos Run LLC would object to an equity investment by Mr Jian's
firm, and that Wellington Shields should cancel the planned
closing with Bouxtie. Lipson stated that he was preparing civil
and criminal complaints against Mr Libric, and was attempting to
take control of, and reorganize Bouxtie. In the light of this
information Wellington Shields cancelled the closing planned for
the following week.

C.33   The California Supreme Court has held that California Business &
Professions Code §17200, is defined very broadly, and shall
include anything that can properly be called an unfair, unlawful
or fraudulent business practice. Mr Lipson's attempted blackmail
of the Bouxtie Board to achieve Lipson's appointment of chief
executive, is a clear violation of §17200.

C.34   Moose Run LLC, together with its agent and controller Mr David
Lipson, have engaged in threats, blackmail and unfair practice

-30-

to cripple the financial lifeblood of Bouxtie Inc., as retaliation for Bouxtie's refusal to yield to Lipson's demands. As a consequence, Bouxtie has been unable to finish the research, development, coding and programming required to offer digital gift card technology and products to China and Brazil, has been unable to settle all its current debts and obligations, and is facing bankruptcy threatened by plaintiff and its controlling shareholder representative, Mr David Lipson, see 35 below.

C.35 The punitive actions of plaintiff and Lipson to exsanguinate the lifeblood of Bouxtie, attack Mr Libric, one of Bouxtie's founders and point man Salesforce, DOTZ and Tencent, were unnecessary, counter productive, and self defeating. Mr Lipson's plan for a hostile takeover of Bouxtie, a business valued by plaintiff at nearly $40 million, for just $1.5 million, was a high risk strategy, and doomed to failure because:

1. Lipson did not have the technical knowledge to develop the coding and programming himself.

2. Lipson did not have any relationship with Bouxtie's existing or potential customers to build trust and goodwill.

3. Lipson's hostile actions were opposed by all 36 directors and shareholders.

4. Lipson lacked any alternative business plan or strategy, other than one to bankrupt Bouxtie and gain control of Bouxtie's intellectual property and business model.

5. The concealment of his prior conviction for civil securities fraud from the Bouxtie Board and shareholders, bred resentment and distrust towards Lipson, throughout the firm and its

associates that will be difficult to repair.

Had Mr Lipson waited until the Series "B" stock issue completed, a matter of a few days or a week at most, he would have been invited to join the Bouxtie Board, see Pg 14, (45), and been part of a management team dedicated to the successful entry of "Flexawards" into the Chinese and Brazilian markets, likely resulting in plaintiff's stock reaching a valuation of 3.99% of $331.9 Million, or $13.2 Million. See Exhibit "A"

C.36   Instead the plaintiff and its shareholder representative Mr Lipson are scrambling to crack the codes and programming developed by Bouxtie, and have appraoched some of Bouxtie's software developers with offers to buy their intellectual property, which is co-owned by the defendant. He has also approached Bouxtie customers to offer "Flexawards" services. Unfortunately all of Mr Lipson's overtures have been tainted by his unethical and unfair business practices, which have cost himself and his principal, the plaintiff herein, together with every shareholder of Bouxtie millions of dollars in lost income, profits and stock valued conservatively projected at $331 million, See Exhibit "A" attached hereto.

C.37   The Defendant's loss attributable to plaintiff and its shareholder representative controller's actions exceeds $50 milliion. In addition, Mr Libric is also entitled to general, exemplorary and special damages.

**CONCLUSION**

For the reasons set forth herein, Mr Libric respectfully requests the Honorable Court to dismiss counts 1-7, i.e. all seven causes of action listed in the complaint leaving Mr Libric to litigate

his counterclaim and enjoin other directors and shareholders who
have also been harmed and damaged by Moose Run LLC and its
shareholder reprsentative controller Mr David Lipson.

Respectfully submitted,           Dated: November 19, 2019

_____

Renato Libric
Defendant pro se

# CERTIFICATE OF SERVICE

I, ____Renato Libric_____hereby certify that I have served a true and correct copy of the following:

AMMANDED REPLY TO PLAINTIFF SUMMONS
AND COMPLAINT

Which is deemed filed at the time it was deposited in Taft Correctional Institution's internal mail system, since TCI has no separate system designed for legal mail, in accordance with Rule 4, Federal Rules of Appellate Procedure and Houston V. Lack, 108 S. Ct. 2379 (1988), by placing same in a sealed, first class postage prepaid envelope addressed to :

Ronald S. Kravitz Esq.
Shepard Finkelman Miller & Shah LPP
201 Filbert Street, Suite 201
San Francisco, CA 94133

and depositing same in the institution mail box at Taft Correctional Institution at Taft, California.

I declare, under penalty of perjury (Title 28 U.S.C.  1746), That the foregoing is true and correct.

Dated this _____19____ day of ____November____, 201̶9̶ .

Renato Libric, Defendant Pro se